UNITED STATES of America, Plaintiff,

v.

Devonn Deshea KINSEY, Defendant.

No. CR–13–6003–EFS.

United States District Court, E.D. Washington.

July 3, 2013.

---

**11.** As noted, after oral argument in this case, the Oregon Supreme Court issued an opinion in *Niday.* 353 Or. 648, 302 P.3d 444.

Alexander Carl Ekstrom, United States Attorneys' Office, Yakima, WA, for Plaintiff.

Rebecca L. Pennell, Federal Defenders, Yakima, WA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

EDWARD F. SHEA, Senior District Judge.

### I. INTRODUCTION

A pretrial conference and evidentiary hearing occurred in the above-captioned matter on June 5, 2013. Defendant Devonn Deshea Kinsey was present, represented by Rebecca L. Pennell. Assistant U.S. Attorney Alexander C. Ekstrom appeared on behalf of the U.S. Attorney's Office (USAO). At the hearing, the Court orally ruled on several pending motions, ECF No. 64; the Court subsequently entered a written Order memorializing and supplementing those rulings, ECF No. 68. Also before the Court at the hearing was Defendant's Motion to Suppress, ECF No. 43, which the Court took under advisement at the time. ECF No. 64. By subsequent Order, the Court summarily denied the motion, indicating that a detailed written order would be forthcoming. ECF No. 67.

This Order memorializes and supplements that ruling.

### II. BACKGROUND

Shortly after 2:14 a.m. on January 12, 2013, the Kennewick Police Department received a 911 call from a resident of the Heatherstone Apartments, who reported that a number of gang members were trying to force their way into his apartment. Several officers arrived within minutes and encountered five people standing outside the apartment, who, upon seeing the police, promptly scattered in different directions. One of the individuals who fled was Defendant.

Detectives Schwartz and Dorame pursued Defendant on foot, identifying themselves as police officers and ordering him to stop. Defendant, who was apparently intoxicated, turned a corner around one of the apartment buildings, ran into a large, stationary power meter, and stumbled to the ground. He tried to get up and continue fleeing, but the detectives were able to catch him and prevent his escape.

The officers promptly handcuffed Defendant to forestall violent resistance and prevent any further attempts to abscond. Next, Detective Schwartz patted down the Defendant's pockets to determine if Defendant was armed. Despite the fact that Defendant was wearing "very baggy loose clothing," Ex. C to Def.'s Mot. to Suppress, ECF No. 43–1, at 16, Detective Schwartz felt a hard, metallic object in Defendant's right front pocket. Recognizing that the object was clearly not a cell phone, and "believing that it could [have] be[en] a knife or other weapon," id. Ex. B, ECF No. 43–1, at 15, Detective Schwartz removed the object and discovered it to be a .40 caliber pistol magazine containing eight rounds of ammunition. After confirming that Defendant had previously been convicted of a felony, Detec-

tive Schwartz arrested Defendant. A criminal complaint was filed with this Court on January 16, 2013, ECF No. 1, and on February 6, 2013, Defendant was indicted for Unlawful Possession of Ammunition by a Prohibited Person in violation of 18 U.S.C. § 922(g)(1), ECF No. 18.

On May 8, 2013, Defendant moved to suppress the magazine and ammunition obtained during Detective Schwartz's patdown search. On June 5, 2013, the Court heard argument from counsel and held an evidentiary hearing on the motion. At the hearing, Detective Schwartz testified that, during the patdown, he could not determine exactly what the object in Mr. Kinsey's pocket was, but he believed it could be a knife or other weapon. Detective Schwartz specifically stated that he "felt [the object] the best I could from outside of [Defendant's] jeans, felt that it was a possible weapon, and to determine if it was or was not, I removed it." Testimony of Det. Schwartz, 6/5/13 Hearing on Def.'s Mot. to Suppress (working transcript), at 58.

### III. *DISCUSSION*

Defendant seeks to suppress the magazine and ammunition for two reasons. First, he claims that his detention constituted a *de facto* arrest without probable cause; second, he argues that Detective Schwartz improperly removed the magazine from his pocket without knowing what it was, thereby exceeding the proper scope of a patdown search. Each of these contentions is addressed in turn below.

### A. *De Facto* Arrest

■ Defendant first argues that his detention constituted a *de facto* arrest, which exceeded the scope of a permissible investigatory detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defendant contends that any evidence obtained following his unlawful *de facto* arrest—namely, the magazine and ammunition—must be suppressed.

■ It is well-settled that, "[i]n the name of investigating a person who is no more than suspected of criminal activity, the police may not ... seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Id.* at 501, 103 S.Ct. 1319. "[T]he purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *United States v. Miles,* 247 F.3d 1009, 1012 (9th Cir.2001) (internal quotations omitted). A *Terry* stop generally consists of, at most, " 'a brief stop, interrogation, and under proper circumstances, a brief check for weapons.' " *Id.* (quoting *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir.1987)). If the *Terry* stop exceeds this limited intrusion, it has become a *de facto* arrest, requiring probable cause. *Id.*

■ Handcuffs may be used during a *Terry* stop under several specific circumstances, including 1) "when it is a reasonable response to legitimate safety concerns on the part of the investigating officers," 2) when "police have information that the suspect is currently armed," or 3) when "the stop closely follows a violent crime." *Id.* at 1012–13. The Ninth Circuit also directs courts to consider " 'the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought' and 'the number of police officers present.' " *Id.* at 1013 (quoting *Washington v. Lambert,* 98 F.3d 1181, 1187 (9th Cir.1996)).

In this case, Detectives Schwartz and Dorame were justified in handcuffing Defendant, and their conduct did not rise to the level of a *de facto* arrest. The detectives were responding to a possible attempted residential burglary, where it was reported that the suspects were loudly banging on the front door of—and trying to forcibly enter—an occupied apartment. *See* Exs. A & B to Def.'s Mot., ECF No. 43–1, at 10–15. When police arrived to investigate, the suspects promptly fled. Moreover, detectives were advised that the suspects allegedly had gang connections. The detectives had legitimate safety concerns regarding Defendant and a reasonable belief that their detention of Defendant had closely followed a violent, potentially armed crime.[1]

Contrary to Defendant's assertion, the fact that he was intoxicated does not reduce the level of threat he posed to the detaining officers. Intoxicated persons can become irrationally violent and, without warning, can viciously attack and injure unsuspecting police officers. *Cf. Long v. Coates,* 60 Wash.App. 710, 712, 806 P.2d 1256 (Div.3, 1990) (describing a violent stabbing of an off-duty police officer by an intoxicated driver who sought to flee from the scene of a hit-and-run accident). The fact that Defendant was intoxicated does not reduce the officers' justification for handcuffing him; on the contrary, it enhances it.

Furthermore, the use of handcuffs was a minimal intrusion when balanced against Defendant's attempt to evade police; indeed, it was a legitimate attempt to immobilize a noncompliant suspect to forestall a further escape attempt. There is no evidence that the detectives had such overwhelming numbers or force that the handcuffs were unnecessary; in fact, Detective Schwartz testified that only the two detectives were present when Defendant was initially captured. Under these circumstances, the use of handcuffs did not rise to the level of a *de facto* arrest.

## B. Removal of Ammunition from Defendant's Pocket

■ Defendant also challenges Detective Schwartz's decision to remove the pistol magazine from Defendant's pocket while conducting a patdown search. Defendant contends that the removal of the object from his pocket exceeded the lawful scope of a *Terry* frisk, and that evidence of the magazine—and the ammunition contained therein—must therefore be suppressed.

■ During an investigative stop, a law enforcement officer may conduct a patdown search of the exterior of a suspect's clothing when the officer has reasonable suspicion that the person is armed and dangerous. *Terry,* 392 U.S. at 30–31, 88 S.Ct. 1868. During that patdown search, if the officer encounters an object which he knows to be weapon, the officer may remove and seize it. *Id.* at 29–30, 88 S.Ct. 1868. But if the officer rules out the possibility that the object is weapon, the officer must cease any further attempts to manipulate the object, and the object may not be seized unless "the incriminating character of the object [is] immediately apparent...." *Minnesota v. Dickerson,* 508 U.S. 366, 379, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

---

1. Although the responding officers had no explicit indication before arriving at the scene that any of the suspects were armed, the Ninth Circuit has recognized that "a suspect caught possibly in the act of committing a nighttime burglary [is] more likely to be armed" than those suspected of other crimes, like counterfeiting. *United States v. Mattarolo,* 209 F.3d 1153, 1158 (9th Cir.2000).

" 'The purpose of [a *Terry* frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . .' " *Id.* at 373, 113 S.Ct. 2130 (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Thus, officers may conduct a patdown search solely " 'to determine whether the person is in fact carrying a weapon.' " *Id.* (quoting *Terry,* 392 U.S. at 24, 88 S.Ct. 1868). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.*

With that basic framework in mind, the question raised by Defendant's motion is whether an officer may remove an object from a suspect's pocket, based on a well-grounded and reasonable suspicion that the object *could be* a weapon, for the purpose of confirming or dispelling that suspicion. During the evidentiary hearing, Defendant argued that if the officer is unable to confirm or dispel that belief through exterior touch alone, he must cease his efforts and, in essence, face the uncertainty with no recourse. In essence, Defendant contends that *Dickerson*'s holding— that removal of a non-weapon object from a suspect's pocket is only justified if the incriminating character of the object is immediately apparent—should be extended to cases where the officer suspects, but cannot conclusively determine, that the object is a weapon. This contention finds no support in *Terry, Dickerson,* or any of the other precedents cited by Defendant.

■ In *Dickerson,* the Supreme Court determined that a law enforcement officer's seizure of drugs from a defendant's pocket was unjustified when the officer "squeez[ed], slid[ ], and otherwise manipulat[ed] the contents of the defendant's pocket—a pocket which the officer *already knew contained no weapon.*" *Dickerson,*

508 U.S. at 378, 113 S.Ct. 2130 (emphasis added). The Court recognized that "the officer's continued exploration of respondent's pocket *after having concluded that it contained no weapon* " was unrelated to the sole rationale for a patdown search under *Terry:* "the protection of the police officer and others nearby." *Id.* (emphasis added) (internal quotations and alterations omitted). Because the rationale for a further search of the defendant had ceased with the officer's conclusive determination that no weapon was present, the Court held that any further search or seizure was unconstitutional because the "incriminating character of the object was not immediately apparent" to the officer. *Id.* at 379. In other words, *Dickerson*'s "immediately apparent" standard is expressly predicated on there being no rationale for any further search: it applies once the officer has no reasonable basis to believe that a weapon could be present. But, as long as the officer reasonably believes that an unknown object may be a weapon, *Dickerson* does not preclude the officer from continuing to search.

Other cases relied upon by Defendant support this reading of *Dickerson.* In *United States v. Mattarolo,* 209 F.3d 1153 (9th Cir.2000), the Ninth Circuit upheld a law enforcement officer's patdown search of a suspect following a nighttime traffic stop. During the patdown, the officer felt "a cylindrical object several inches long in the defendant's pocket . . . [which] was large enough that it could have been a pocket knife." *Id.* at 1158. The officer squeezed the object to determine whether it was a knife, and in the process, he identified the object as illegal narcotics. In upholding the search, the Ninth Circuit noted that "[t]he possibility of a surprise attack at close quarters with even a small knife presents danger sufficient to justify an officer in taking reasonable protective

measures, and such a precautionary squeeze is well within the scope of *Terry*." *Id.* Because the officer reasonably believed the object could be a weapon, the *Mattarolo* court held that he was justified in squeezing the object to confirm or dispel his suspicion. As the *Mattarolo* court indicated, "[h]ad the officer continued to manipulate the object *beyond what was necessary to ascertain that it posed no threat*," he would have breached the limits imposed by *Dickerson. Id.* at 1158 (emphasis added). But having not yet made that determination, the officer was not yet bound by *Dickerson*'s "immediately apparent" limitation.

In *United States v. Miles*, 247 F.3d 1009 (9th Cir.2001), the Ninth Circuit again emphasized that *Dickerson*'s "immediately apparent" rule applies only once the officer determines that the questionable object is *not* a weapon. In *Miles*, while patting down a suspect, the officer encountered a box "no bigger than a large package of chewing gum," *id.* at 1014, and shook the box while it was still inside the defendant's pocket, at which point he discovered that it contained ammunition. The court held that "[w]hile the officer may have been patting down for a weapon, he had reached the outer limits of his patdown authority when it was clear that the object was a small box *and could not possibly be a weapon.*" *Id.* (emphasis added). The government argued that the officer might have been looking for a tiny pen knife, needle, or other small weapon, but the Ninth Circuit emphasized that the officer "did not testify to such a motivation." *Id.* at 1015. Because the officer never testified, the court concluded that the government failed to show that the officer reasonably believed that the box could be or could contain a weapon; and without that belief, the officer's search was impermissible. *Id.* As recently as November 2012, the Ninth Circuit again reaffirmed that an essential consideration in defining the bounds of a lawful search is whether the officer has a subjective, reasonable belief that an unknown object may be weapon. *See United States v. I.E.V.*, 705 F.3d 430, 440–41 (9th Cir.2012) ("[W]e cannot assume that the officer 'might legitimately' have been searching for a weapon when he lifted the Defendant's shirt; the searching officer did not testify regarding the reasons for the search.").

*Dickerson, Miles,* and *I.E.V.* all share a common thread. In each case, at the point the search moved beyond a simple exterior patdown, the officer who searched the defendant did not reasonably believe (or, at least, did not testify to reasonably believing) that the object in the defendant's pocket could have been a weapon. In *Dickerson* and *Miles,* the officer had affirmatively ruled out the possibility of a weapon; and in *I.E.V.*, the officer never testified to such a belief. On the other hand, in *Mattarolo,* the officer's precautionary squeeze was deemed "well within the scope of *Terry*" precisely *because* the officer still believed the object could be a weapon at the point his search exceeded a simple exterior patdown. When read together, these cases all stand for the unremarkable proposition that once an officer has ruled out the possibility of concealed weapons, the justification for any further searches under *Terry* ceases, and unknown objects may only be seized if their incriminating nature is readily apparent.

But that is not what occurred here. In this case, not only had Detective Schwartz *not* ruled out the possibility that a weapon was present, he had a well-grounded and reasonable suspicion that the object in Defendant's pocket *was* a weapon. None of the cases cited by Defendant require Detective Schwartz to ignore his suspicions and risk an armed and violent encounter with a noncompliant suspect because he

could not decisively confirm—based solely on a cursory patdown through the exterior of baggy clothing—that the unknown object was, in fact, a weapon.

*United States v. Hartz,* 458 F.3d 1011 (9th Cir.2006), is far more apposite here. In *Hartz,* following a traffic stop to investigate a potential carjacking, a law enforcement officer asked the defendant, a passenger, to step out of the vehicle; at that point, the officer saw a gun sitting on the passenger seat. *Id.* at 1015. The officer promptly frisked the defendant and felt a metal container and golfball-sized bundle in one front pocket, and a narrow object in the other pocket. *Id.* The officer removed the items, believing that "each of [the] items could be, or could conceal, a weapon," *id.* at 1018; upon removal, he identified the items as drug-related contraband and seized them. The *Hartz* court upheld the search, distinguishing the case from *Miles,* because the searching officer testified "that he thought the items in [the defendant's] pockets might be weapons." Under the circumstances, the Ninth Circuit concluded that the officer had "conducted a valid patdown search under *Terry.*" *Id.* The *Hartz* court did not require the "incriminating character" of the objects to be immediately apparent before they were removed, and the reason seems clear: the officer was still operating under a reasonable belief that the objects could be weapons.

Defendant's contention—that it must be immediately apparent that a suspected-but-not-confirmed weapon is actually a weapon before the officer can remove it—amounts to circular reasoning. If an officer detects an object he believes could be a weapon, but he cannot say so with certainty, the incriminating nature of the object is, by definition, not immediately apparent. The effect of Defendant's proffered rule, then, is that officers could only seize those

objects which are, upon first touch, obviously weapons; and if the officer cannot tell from that initial patdown, he would be precluded from searching further. This unduly restrictive approach is not supported by *Terry,* and in fact, runs counter to its very purpose of promoting officer safety.

Although *Terry* expressly approved of an exterior patdown as a reasonable search to effectuate officer safety, *Terry* also recognized that a one-size-fits-all approach was ill-advised. The Supreme Court recognized that a different kind of search might be reasonable under different circumstances, as long as the search is "necessary for the discovery of weapons which might be used to harm the officer or others nearby." *See Terry,* 392 U.S. at 26, 88 S.Ct. 1868. Rather than just approving a single method or procedure, the Court was more concerned with ensuring that whatever search was performed in the name of officer safety was "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. 1868. Because the officer in *Terry* had "confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons," the Court found that an exterior patdown search was reasonable. But the Court also repeatedly cautioned that the reasonableness of a particular search is a fact-dependent inquiry unique to each case; in fact, the Supreme Court expressly declined to "develop at length ... the limitations which the Fourth Amendment places upon a protective seizure and search for weapons [because] [t]hese limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.* at 29, 88 S.Ct. 1868; *see also id.* at 30, 88 S.Ct. 1868

("Each case of this sort will, of course, have to be decided on its own facts.").

■ While *Terry* acknowledges that exterior patdowns are one type of permissible search under certain circumstances, *Terry* does not purport to limit law enforcement officers to only conducting exterior patdowns, particularly when officers discover objects they reasonably believe could be weapons. Defendant may well be correct that a *Terry* frisk is the constitutionally required starting point, as it constitutes the most minimal form of invasion. But an officer need not ignore potential weapons he discovers during a *Terry* frisk simply because he cannot determine exactly what kind of weapon it is while patting it through layers of clothing. As long as the officer employs the minimally necessary level of invasion at each step of his search, and only to the extent necessary to confirm or dispel his suspicion that a concealed object may be a weapon, the nature of the intrusion does not exceed the scope of, and justification for, *Terry:* promoting "the protection of the police officer and others nearby." *Id.* at 29, 88 S.Ct. 1868.

Here, the Court concludes that Detective Schwartz subjectively believed that the object in Defendant's pocket could have been a knife or other weapon, and his subjective belief was reasonable under the totality of the circumstances. The object he felt was hard, metallic, and in a shape consistent with a switchblade or other knife.[2] He testified that he patted down the object while it was in Defendant's pocket, feeling the object as best he could to determine whether it was a weapon. Suspecting that it could be but unable to tell for sure, and left with no alternative, he performed the most minimally intrusive search that he could to confirm or dispel his suspicion: he removed the object from Defendant's pocket. Given the circumstances in which he found himself—a 2:00 a.m. foot pursuit of a fleeing and noncompliant suspect with possible gang ties, following an attempted burglary call at an occupied residence—Detective Schwartz had good reason to believe that he was dealing with an armed suspect. His search was reasonable, as minimally invasive as possible, and necessary to resolve his suspicion that he was confronting an armed suspect. In sum, he conducted a valid search under *Terry*.

## IV. *CONCLUSION*

When Detective Schwartz and Dorame detained Defendant with handcuffs, they were sufficiently justified in doing so, and their conduct did not rise to the level of a *de facto* arrest. When Defendant Schwartz removed the hard metallic object from Defendant's pocket, believing in good faith that it could be a knife or other weapon, his conduct was within the lawful bounds of a *Terry* search. For these reasons, Defendant Kinsey's Motion to Suppress, **ECF No. 43,** is **DENIED.**

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

---

**2.** At defense counsel's request, during the evidentiary hearing, the Court palpated the pistol magazine while it was contained in a plastic evidence bag. While clearly not the same as palpating the object through jeans or other clothing, the Court was persuaded from its physical inspection of the object that Detective Schwartz's belief that the object could be a weapon when he palpated it through Defendant's clothes was reasonable.